UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KENT WILLIAMS,<br><br>                Plaintiff,<br><br>vs.<br><br>DR. WALTER CAMPBELL, et al.,<br><br>                Defendants. | Case No. 1:22-cv-00346-BLW<br><br>**MEMORANDUM DECISION AND ORDER RE: DKT. 54 (Quentin Jackson Motion for Summary Dismissal)** |

Having had two opportunities to amend his pleadings, Plaintiff Kent Williams ("Plaintiff") has brought First and Eighth Amendment claims against Defendant Quentin Jackson ("Jackson") and others in his Second Amended Complaint. Dkt. 24. Jackson has filed a Motion for Summary Dismissal under Federal Rule of Civil Procedure 12(b)(6) (Dkt. 54), which is now fully briefed (Dkts. 58, 60, 62).

Having reviewed the parties' filings, the Court finds that Jackson and all Defendants are entitled to summary dismissal on the Eighth Amendment food-related claims. The Court finds that additional facts are needed to determine whether Plaintiff has stated First Amendment claims. Thus, the Court will convert the pending 12(b)(6) motion to a Rule 56 motion for summary judgment and order the parties to provide additional briefing and evidence.

**MEMORANDUM DECISION AND ORDER RE: DKT. 54 (Quentin Jackson Motion for Summary Dismissal) - 1**

## STANDARDS OF LAW

In deciding Rule 12 motions, the Court generally does not consider materials outside the complaint, pleadings, and uncontested exhibits to the pleadings. *See Cooper v. Pickett*, 137 F.3d 616, 622-23 (9th Cir. 1997). To survive summary dismissal, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Vague and conclusory allegations of official participation in civil rights violations are not sufficient. *See Ivey v. Board of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). Rather, "[l]iability under section 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (stating that there is no respondeat superior liability under §1983).

Dismissal is appropriate if there is a lack of a cognizable legal theory or a failure to plead sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). In addition, the Court retains screening authority to dismiss claims "at any time" during the litigation under 28 U.S.C. § 1915(e).

When the Court determines that evidence beyond the pleadings is required to decide the issues presented in a 12(b) motion, the Court may (1) consider evidence as a

supplement to the Complaint under its § 1915 screening authority to determine whether Plaintiff has stated or could state a claim; or (2) convert a Rule 12 motion into a Rule 56 motion for summary judgment and give the parties notice and an opportunity to respond before making a ruling on the motion. Fed. R. Civ. P. 12(d); *see* Fed. R. Civ. P. 56(e)(1).

## REVIEW OF MOTION FOR SUMMARY DISMISSAL

Plaintiff's claims center on a time period when he decided he was not going to answer mental health intake or wellness check-up questions about whether he was suicidal. Plaintiff's continued refusal to do so gave mental health personnel no choice but to place him on suicide watch until he answered. There is nothing in the law that requires mental health professionals to take Plaintiff's silence as an affirmation that he is not suicidal, and, in fact, if they did so, and he committed suicide, they could be held liable for that decision. However, the longer Plaintiff remained on suicide watch because he refused to state that he was not suicidal, the more his necessarily restrictive conditions may have affected his mental and physical wellbeing.

Defendant Jackson asserts that he is entitled to summary dismissal of all claims against him because Plaintiff has mentioned Jackson's name only three times in the Second Amended Complaint, "each without a logical connection to the substance of his claims." Dkt. 54-1 at 2. Plaintiff states that his claims against Jackson are "related to food only." Dkt. 24 at 75, ¶ 252. Plaintiff has raised several issues in his Response and Sur-reply that require additional facts to decide the First Amendment claims. (Dkts. 58, 62.)

**MEMORANDUM DECISION AND ORDER RE: DKT. 54 (Quentin Jackson Motion for Summary Dismissal) - 3**

1. **First Amendment Retaliation Claims**

A First Amendment retaliation claim must allege the following: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, ... that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). Although a "chilling effect on First Amendment rights" is enough to state an injury, *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001), "bare allegations of arbitrary retaliation" are insufficient to state a retaliation claim, *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985).

The timing of an official's action can constitute circumstantial evidence of retaliation, but there generally must be something more than simply timing to support an inference of retaliatory intent. *See Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995). Retaliation is not established simply by showing adverse activity by the defendant *after* protected speech; the plaintiff must show a nexus between the two. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (stating that a retaliation claim cannot rest on "the logical fallacy of *post hoc, ergo propter hoc*, literally, 'after this, therefore because of this'").

Plaintiff alleges Defendant Jackson, a Idaho Department of Correction ("IDOC") mental health clinician, violated his First Amendment right to free speech by retaliating against him for stating that the mental health personnel were causing him to be suicidal

by demanding that he answer the question whether he was suicidal. The retaliation allegedly consisted of Jackson ordering Plaintiff to be served an alternative diet called "finger food" (Dkt. 62 at 2), with his entire meals on non-divided plates with no individual food wrappers, which Plaintiff analogizes to being served "(at times) essentially nutraloaf." (Dkt. 24 at 11 (verbatim).)[1] Plaintiff alleges that the diet was "deliberately fashioned to be unappetizing." (Dkt. 62 at 2 (spelling corrected).)

Plaintiff now asserts that "some" of the food served to him actually was nutraloaf. Dkt. 58 at 3. That is a food substance made by using a blender to mix and pulverize a variety of prison meals until indistinguishable, and then baking the "batter" into a solid loaf that meets dietary nutrition requirements but is not appetizing. *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993). Whether the food was, in fact, nutraloaf, or was "essentially nutraloaf," both of which Plaintiff has alleged, it is constitutional to use nutraloaf for disciplinary reasons, including to encourage persons who are being non-cooperative to realize that cooperation is necessary to regain prison privileges. *See, e.g., Davis v. Penzone*, No. CV1901972PHXSMBCDB, 2020 WL 1325407, at *10 (D. Ariz. Feb. 3, 2020), *report and recommendation adopted sub nom. Davis v. Jeans*, No. CV1901972PHXSMBCDB, 2020 WL 1323113, at *10-11 (D. Ariz. Mar. 20, 2020) (holding that the policy of imposing a food loaf diet on detainees did not violate the

---

[1] Plaintiff's meal modifications included the following: the exchange of a rubber spork for a paper scoop; the exchange of a standard compartmentalized tray to an open Styrofoam tray; and the removal of all food packaging, including condiment packets, by prison guards before being served to Plaintiff. See Dkt. 24 at 11, ¶23.

**MEMORANDUM DECISION AND ORDER RE: DKT. 54 (Quentin Jackson Motion for Summary Dismissal) - 5**

evolving standards of decency in the absence of a physical harm as a result the temporary diet); *see* Alexander J. Spanos, *The Eighth Amendment and Nutraloaf: A Recipe for Disaster*, 30 J. Contemp. Health L. & Pol'y 222, 248 (2013) ("Generally, if prisoners act in accordance with the rules of their confinement, then nutraloaf will not be served. The Eighth Amendment will, and should, protect those who are either being served less than the nutritional requirements when it comes to food or food that is physically harmful, but inmates cannot break the rules and subsequently cry foul solely based on unappealing and unappetizing food."). In short, the Constitution requires inmates be provided food sufficiently nutritious to maintain health, but the food is not required to be appetizing. *Lemaire*, 12 F.3d at 1456.

      The issue that needs further briefing is whether all inmates on suicide watch who were similarly situated to Plaintiff were fed "finger-food" and nutraloaf meals plated in this safety-oriented presentation, or whether, after a time on suicide watch (where Plaintiff had chosen to place himself by refusing to answer clinician questions about whether he was suicidal), Plaintiff was singled out for this treatment, and, if so, whether the diet was for a legitimate penological reason after an assessment of Plaintiff's mental health.  Defendant Jackson or another person with knowledge of these facts should clarify the circumstances in an affidavit, including facts about under what circumstances other inmates would have been fed the same.

      In *LeMaire*, the court found that the plaintiff had failed to present facts showing that "officials had a sufficiently culpable state of mind to meet the subjective test." 12

**MEMORANDUM DECISION AND ORDER RE: DKT. 54 (Quentin Jackson Motion for Summary Dismissal) - 6**

F.3d at 1456. The court concluded: "There is not a scintilla of evidence in this record to indicate that the officials imposing Nutraloaf were either deliberately indifferent to Lemaire's health or welfare, or that as a sanction they were imposing Nutraloaf 'maliciously or sadistically for the very purpose of causing harm.' *Id*.

Plaintiff previously stated he may have seen Jackson's name on an "operations order" or "ops order" initiating modification of Plaintiff's meals to "finger foods" plated in the safety-oriented presentation. He now states in a declaration he did, in fact, see Jackson's name on the "ops order" (Dkt. 58-1 at 5; Dkt. 62 at 8). Plaintiff does not have a copy of the "ops order."

Jackson's counsel argues that, even if his name is on the "ops order," he merely *recommended* the diet change, and that Plaintiff's allegation that administrative staff had the final authority to approve or disapprove the diet eradicates any liability of Jackson. Not so. If the diet violated Plaintiff's rights, Jackson had personal participation in the violation, regardless of whether a higher authority also agreed with him. Had Jackson not recommended the diet, it may not ever have been adopted.

Jackson should clarify whether he completed an "ops order" recommending Plaintiff to be served finger-food or nutraloaf plated in the safety-oriented presentation, the status of Plaintiff's mental health at the time the diet change was initiated, whether Plaintiff had kosher meal status at that time (discussed in more detail directly below), and whether the kosher food factor influenced his decision. If a copy of the "ops order" (or similar document) exists, Jackson should produce it. This portion of the Motion for

**MEMORANDUM DECISION AND ORDER RE: DKT. 54 (Quentin Jackson Motion for Summary Dismissal) - 7**

Summary Dismissal will be denied without prejudice to the Court reconsidering it under Rule 56 when the parties have submitted their supplements.

### 2. First Amendment Free Exercise Claims

Plaintiff alleges that Jackson's order for meal modification was non-kosher and violated his First Amendment free exercise of religion rights. Plaintiff, who follows the eating regimen of The Old Testament, asserts he was unable to eat the food provided in suicide watch because it was non-kosher and against his religion to consume it. The record is unclear whether Plaintiff rejected the food on religious grounds because it was, in fact, of a non-kosher variety, or if it was kosher foods that should not have been touching each other according to the religious code. Dkt. 24, p. 12, ¶25. It is also unclear whether this claim has been exhausted.

If Jackson had a hand in Plaintiff's meal selection and/or if Defendants assert that they did not serve Plaintiff his approved religious diet for adequate safety reasons on suicide watch, while other similarly-situated inmates in the same unit were permitted to have their religious diets on divided food trays or in individual packaging, the Court must engage in the following legal analysis.

Prisoners have the First Amendment right to be served food that satisfies religious dietary laws. *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993). *See McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987). When a prison regulation impinges on an inmate's free exercise rights, the regulation is valid if it is reasonably related to legitimate

penological interests. *Id*. at 876; *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987); *Turner v. Safley*, 482 U.S. 78, 89 (1987).

*Turner* established four factors to consider in determining whether a regulation is reasonably related to a legitimate penological interest: (1) whether there is a "rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether "there are alternative means of exercising the right that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether "ready alternatives" at a "de minimis cost" exist, which "may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id.* at 89-93. A *Turner* analysis generally is appropriate at the summary judgment phase, rather than the motion to dismiss phase.

Disparate treatment among inmates can call into question whether prison officials' stated reasons for the treatment of an individual is a legitimate penological interest. *Cf. Rouser v. White*, 630 F.Supp.2d 1165, 1190 (E.D. Ca. 2009); *Howard v. United States*, 864 F.Supp. 1019, 1025 (D.Colo. 1994) (Satan worshipper permitted to use candles because "other religious groups regularly use these very same—allegedly very dangerous—implements"). However, where the rule prompted by the safety concern is applied to all religions in a neutral manner, a prisoner cannot prevail on a *Turney v. Safley* analysis. *See Ward v. Walsh*, 1 F.3d 873, 879 (9th Cir. 1993) ("The serious safety and security concerns raised by allowing inmates to possess and use candles outweigh the

**MEMORANDUM DECISION AND ORDER RE: DKT. 54 (Quentin Jackson Motion for Summary Dismissal) - 9**

curtailment of Ward's religious practice. Thus, we conclude that the regulation is reasonably related to a legitimate penological purpose and thus is valid under *Turner*.").

It would be helpful for Jackson to show whether Plaintiff had sought and been approved for a kosher diet before his placement in the suicide unit. Jackson should also disclose the policy behind whether prison officials observe kosher rules and other religious dietary rules for serving meals to inmates on suicide watch, or whether policy permits them to not serve kosher meals to inmates who have been approved for kosher meals because of safety concerns applied uniformly to inmates of all religions. If the change of meal was for a penological reason other than safety, for example, to help Plaintiff understand he should verbally answer the question of whether he was suicidal instead of making clinicians take the safest and most restrictive route available and instead of occupying a suicide cell if it was not needed, Jackson should provide that information. Jackson should inform the Court whether the meals served to Plaintiff on suicide watch were of the kosher variety, and, if so, whether meat and milk items were then mixed or touching each other when removed from the packaging and placed on the undivided plate. If appropriate under the law and facts, and for the sake of judicial efficiency, Jackson may add a qualified immunity and/or exhaustion argument in his supplement.

3. **Eighth Amendment Cruel and Unusual Punishment Claim**

The conditions under which a prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment. *See Farmer v.*

**MEMORANDUM DECISION AND ORDER RE: DKT. 54 (Quentin Jackson Motion for Summary Dismissal) - 10**

*Brennan*, 511 U.S. 825, 832 (1994); *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). To succeed on a cruel and unusual punishment claim, a plaintiff must show "'the officials act[ed] with a sufficiently culpable state of mind'" and "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 303 (1991)). "Deliberate indifference" is the proper standard for the subjective state of mind. *See Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). To establish an official's deliberate indifference, an inmate must show that (1) the official was aware of the risk to the prisoner's health or safety, and (2) the official deliberately disregarded that risk. *Farmer*, 511 U.S. at 837.

     Plaintiff argues that serving him finger-food in an unappetizing fashion or nutraloaf is cruel and unusual punishment in violation of the Eighth Amendment. Plaintiff incorrectly argues that the United States Court of Appeals for the Ninth Circuit has held that serving nutraloaf to inmates is cruel and unusual punishment. The Eighth Amendment requires inmates be provided food sufficiently nutritious to maintain health, but the food is not required to be appetizing. *Lemaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993). The temporary use of a nutraloaf diet does not meet the deprivation threshold necessary for an Eighth Amendment violation. *Id*. at 1456. Therefore, serving inmates finger-food that is not on divider plates or wrapped in individual packaging is not cruel and unusual punishment.

Plaintiff has failed to establish sufficient facts to state an Eighth Amendment claim against Jackson or any other Defendant regarding the food served to Plaintiff while on suicide watch. All such claims will be dismissed with prejudice as a result of the Motion for Summary Dismissal and/or the Court's screening authority.

### 4. Fourteenth Amendment Claims

Where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham v. Connor*, 490 U.S. 386, 395 (1989). At all relevant times, Plaintiff was a convicted prisoner, not a pretrial detainee (the Fourteenth rather than the Eighth Amendment is used as the prison conditions standard for pretrial detainees). Because the Court has analyzed Plaintiff's claims against Jackson under the more particular textual amendments, it will not also analyze them under the Fourteenth Amendment, because the result is the same.

## ORDER

**IT IS ORDERED:**

1. Defendant Quentin Jackson's Motion for Summary Dismissal (Dkt. 54) in GRANTED in part, as to all Eighth Amendment claims. Pursuant to the Court's screening authority, Plaintiff's Eighth Amendment food claims against all other Defendants are dismissed with prejudice.

2. The Court gives the parties notice that it will reconsider the pending Motion for Summary Dismissal regarding the First Amendment claims against Jackson under Rule 56, converting it into a motion for summary judgment. Therefore, Jackson's Motion for Summary Dismissal (Dkt. 54) is DENIED in part, as to First Amendment claims, pending receipt of supplementation from the parties, whereupon the Court will re-open and re-evaluate that motion, together with the supplements, under Rule 56.

3. Defendant Jackson should file a supplemental memorandum, with or without exhibits, within 45 days after entry of this Order.

4. Plaintiff may file a responsive supplemental memorandum, with or without exhibits, within 30 days after receipt of Defendant's supplemental briefing.

5. Defendant Jackson may file a supplemental reply, but nothing further shall be filed by any party after that, pending further order of the Court.

6. Should either party require disclosure of a fact or item from the other party for the Rule 56 briefing, including for a qualified immunity analysis, that request should be made by letter no later than 14 days after entry of this Order, or 7 days after any responsive supplemental brief is filed. Requests should be answered within 5 business days. Such requests should not be filed with the Court but should be made between parties only.

7. If Jackson prefers to replace the current motion with a completely new motion, he may do so; or, if he prefers to file a separate motion for summary judgment at a later date, if necessary, he may also do so.

8. The parties may also stipulate to or propose a reasonable briefing schedule different from the one set forth above, if needed, and request that the Court adopt it.

DATED: August 5, 2024

B. Lynn Winmill
U.S. District Court Judge